UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                                    :
PHYLIS TANZ,                                         :
                                                    :
                        Plaintiff,                  :    CIVIL ACTION NO. 08-cv-01462- LAK
                                                    :
            - against-                              :
                                                    :
EUGENE KASAKOVE,                                    :
MARKAS FINANCIAL SERVICES, INC.,                    :
                                                    :
                        Defendants.                 :
———————————————————————

## DECLARATION OF RICHARD M. MORTNER
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

RICHARD M. MORTNER, declare as follows:

1.      I am an attorney admitted to the practice of law in the State of New York and

before the United States District Court for the Southern District of New York.  I represent the

Plaintiff, Phylis Tanz, in the above-captioned matter.  I am fully familiar with the underlying

facts and circumstances and I make this Declaration in opposition to Defendant's Motion to

Dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.      Annexed as exhibits hereto, and described below, is the Seconded Amended

Complaint, which is the subject of defendants' motion and six documents that Plaintiff relied

upon in framing the Complaint.  It is respectfully requested that the Court consider these

documents in connection with the instant 12(b)(6) motion, in accordance with *Cortec Indus., Inc.

v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct.

1561 (1992).

3.      On December 6, 1996, one month after the death of Plaintiff's husband; Mrs. Tanz signed a power of attorney prepared by defendant Kasakove, which accorded defendant Kasakove broad powers over every aspect of Mrs. Tanz's financial life (the "Power of Attorney"). The Power of Attorney executed by Mrs. Tanz in favor defendant Kasakove is annexed as Exhibit B

4.      The Power of Attorney is specifically referred to in the Complaint at ¶19. Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

5.      Defendant Kasakove offered to Mrs. Tanz to invest in his company in a letter, dated July 14, 2001.   Allegations regarding this investment which are contained in the Complaint were framed based upon this offering letter.

6.      The offering letter is annexed hereto as Exhibit C.  Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

7.      On or about February 12, 2004, defendant Kasakove sent a letter to Peter Strauss, Esq., in which he stated that plaintiff's investment in his company was a loan.

8.      Defendant Kasakove's letter of February 12, 2004 is annexed hereto as Exhibit D. The letter was relied on in framing the Complaint, in particular, that portion of the Complaint which seeks disgorgement of proceeds from the sale of defendant Kasakove's company. Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

9.      The ongoing fiduciary relationship between defendant Kasakove and Mrs. Tanz, subsequent to her 2001 investment in defendant's company is evidenced in a letter from defendant Kasakove to Mrs. Tanz, dated July 10, 2003.

10.    Defendant Kasakove's letter of July 10, 2003 is annexed hereto as Exhibit E.  The letter was relied on in framing the Complaint, in particular, that portion of the Complaint which invokes the doctrine of equitable estoppel.  Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

11.    A worksheet for a budget created by Mrs. Tanz in December 2006, containing handwritten comments by defendant Kasakove, such as "Take $5,000 from IRA to pay bills," and "Cut down  - to 1 TV." Is annexed hereto as Exhibit F.  This document evidences that the fiduciary relationship between the parties continued until 2006.

12.    This document was relied on in framing the Complaint, in particular, that portion of the Complaint which invokes the doctrine of equitable estoppel.  Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

13.    The Complaint alleges Plaintiff suffers from mental and physical disorders as a result of the mental pain and anguish caused by Defendant Kasakove's conduct.  These injuries form the basis of Plaintiff's claim for intentional infliction of emotional distress.

14.    In framing the allegations of intentional infliction of emotional distress at ¶¶71-77 of the Complaint, Plaintiff relied in part upon Phylis Tanz's medical history with her treating psychiatrist, Dr. Andrew S. Dalsimer, M.D.  The medical records documenting that history are annexed hereto as Exhibit G.   Plaintiff respectfully requests that the Court consider these records in connection with the instant 12(b)(6) motion.

15.    I declare under the penalty of perjury that the foregoing is true and correct and that this Declaration was executed in New York, NY, on June 16, 2008.

_____/s/_____
Richard M. Mortner

3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PHYLIS TANZ, | : |
| | : |
| | : |
| Plaintiff, | : CIVIL ACTION NO. 08-cv-01462-LAK |
| | : |
| v. | : |
| | : JURY TRIAL DEMANDED |
| EUGENE KASAKOVE and | : |
| MARKAS FINANCIAL SERVICES, INC., | : |
| | : |
| Defendants. | : |
| | : |

**CIVIL ACTION: SECOND AMENDED COMPLAINT**

Plaintiff Phylis Tanz, by her attorney Richard M. Mortner, Esq., for her complaint against defendants respectfully alleges as follows:

**NATURE OF THE ACTION**

1.    Plaintiff, a widow, aged 73 years, alleges breach of fiduciary duty against her former attorney-in-fact, financial advisor and accountant Defendant Eugene Kasakove and his company Markas Financial Services Inc.  Plaintiff alleges that defendant Kasakove's actions, individually and through Markas Financial Services Inc., was malicious, oppressive and fraudulent, and plaintiff seeks lost investment income, disgorgement, punitive damages and attorneys' fees in excess of the statutory jurisdictional amount.  Plaintiff also seeks damages for intentional infliction of emotional distress in excess of the statutory jurisdictional amount.

## VENUE AND JURISDICTION

2.      Subject matter jurisdiction exists based on 28 U.S.C. §1332, because the

amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because the

controversy is between citizens of different states.

3.      Personal jurisdiction over the defendants also is proper based on New

York Civil Practice Law and Rules § 302, and Rule 4 of the Federal Rules of Civil Procedure,

subparagraphs (e) and (h).

4.      Personal jurisdiction and venue in this action are predicated on 28 U.S.C.

§ 1391(a), since a substantial part of the events or omissions giving rise to the claim occurred in

the Southern District of New York.


## THE PARTIES

5.      Plaintiff, Phylis Tanz, is a citizen of the State of New York.  She resides at

715 Park Avenue, New York, NY 10021

6.      Upon information and belief, defendant Eugene Kasakove is a citizen of

the State of New Jersey, and resides at 167 Stephens Park Road, Hackettstown, NJ 07840.

7.      Upon information and belief, defendant Markas Financial Services, Inc.

("MFS") is incorporated in the State of New Jersey, with its principal place of business at 167

Stephens Park Road, Hackettstown, NJ 07840.

8.      Upon information and belief, defendant Kasakove is the president of MFS.

9.      Upon information and belief, defendant MFS, at all material times herein,

was acting on its own behalf and as an agent for Defendant Kasakove.  All acts and omissions by

MFS alleged herein are imputable to Defendant Kasakove by virtue of the aforesaid agency relationship.

## FACTUAL BACKGROUND

10.    Plaintiff, Mrs. Tanz, married Norman Tanz in 1989.  On November 3, 1996, after battling cancer for two years, Mr. Tanz died.

11.    Mrs. Tanz was a dedicated wife, mother and homemaker. Mrs. Tanz's life as a housewife did not equip her with the financial sophistication she needed following the death of her husband.  However, she was acutely aware that she needed to use the utmost caution in handling her limited assets.

12.    During her husband's illness and in the difficult period that followed, Mrs. Tanz found that she could not keep up with the medical and household bills.

13.    Thus, in the period just prior to Norman Tanz's death, Defendant Kasakove, who had been Mrs. Tanz's accountant since 1995, began coming to Mrs. Tanz's home and helping Mrs. Tanz organize her bills.

14.    Following the passing of her husband Mrs. Tanz was under enormous stress.  In addition to grieving over her loss, she was sick with Bell's palsy, type-2 diabetes, and high blood pressure.  In addition, her son suffered a heart attack and had to undergo open heart surgery, Mrs. Tanz's daughter became ill with multiple sclerosis, and lastly, her step-children were contesting her late-husband's will.

15.    During this difficult period, Defendant Kasakove visited Mrs. Tanz in her home and offered to take over the management of Mrs. Tanz's financial matters.  He told Mrs.

Tanz he was not only an accountant, but that he also provided expert services as a stockbroker and financial manager through his company, defendant MFS.

16.    As an elderly woman, Mrs. Tanz firmly believed that the best thing to do was to invest her money very safely and live off of the interest.  She had enough for her needs and she wanted the emotional security of knowing that her money was prudently managed.

17.    Mrs. Tanz told Defendant Kasakove she needed to feel safe and secure; she was very conservative and wanted to live off of her income, not her principal.

18.    Defendant Kasakove agreed with this concept.

19.    On December 6, 1996, one month after Norman Tanz died; Mrs. Tanz signed a power of attorney prepared by defendant Kasakove, which accorded defendant Kasakove broad powers over every aspect of Mrs. Tanz's financial life (the "Power of Attorney").

20.    Defendant Kasakove billed Mrs. Tanz for his service by sending invoices in the name of his company, defendant Markas Financial Services, Inc.

21.    After obtaining Mrs. Tanz's Power of Attorney, defendant Kasakove persuaded Mrs. Tanz to move her nest egg of approximately $493,767 from her broker for the prior 17 years to a new broker who was a friend of defendant Kasakove, Donn Kerr.  In this way defendant Kasakove cut Mrs. Tanz off from the last of her advisors and protectors.

22.    Eventually, plaintiff invested another $31,000, making the total amount of her funds placed under defendants' control $525,767.

23.    Mrs. Tanz owned no property or tangible assets of any significant value. Thus, defendant Kasakove exercised control over virtually all of plaintiff's assets.

24.     Mrs. Tanz lodged complete trust in defendant Kasakove.  Defendant Kasakove supervised every aspect of Mrs. Tanz's financial life, including the payment of her bills.  In addition, as Mrs. Tanz's attorney-in-fact, defendant Kasakove assisted Mrs. Tanz in working with her lawyers to resolve her dispute with her late husband's children and to close the estate.

25.     Mrs. Tanz so relied upon defendant Kasakove that before she would spend any money she would ask Defendant Kasakove whether she could afford the proposed expense.

26.     Immediately upon taking control of Mrs. Tanz's financial life, defendant Kasakove began providing Mrs. Tanz falsely inflated reports regarding the performance of her portfolio under defendants' management.  Defendant Kasakove consistently advised Mrs. Tanz that she "had plenty of money."

27.     Time and again, defendant Kasakove assured Mrs. Tanz that she was a wealthy woman, assured her that she could afford the expenses she was considering and encouraged her to change her frugal lifestyle.

28.     Thus, Mrs. Tanz began to spend money on a lifestyle she had never known before.

29.     Defendant Kasakove advised Mrs. Tanz that these expenditures were being paid from her investment income.

30.     Thus, defendant Kasakove approved, and indeed encouraged, Mrs. Tanz to incur expenses on luxury items such as the following:

a.      Extended stays in Florida at the Boca Raton Hotel, Renaissance Hotel, Holiday Inn Hotel;

b.      A cruise on the Radisson through the Panama Canal and to Costa Rica;

c.      Membership at The Friars Club; and

d.    Membership at the Town Club.

31.    Defendant Kasakove misled Mrs. Tanz into falsely believing that, as a result of defendants' management of her portfolio and financial affairs, she had become substantially wealthier than when she had appointed Defendant Kasakove her attorney-in-fact, and that she was living on the investment income defendants had earned for her through management of her assets.

32.    However, the reality of Mrs. Tanz's financial health was quite different than the rosy picture represented by defendant Kasakove.  In fact, during the period 1997 to 2001, as a result of defendant Kasakove's financial management, misleading and false reports and financial recommendations, Plaintiff had unknowingly spent most of her principal.

33.    In 2001, defendant Kasakove took advantage of Mrs. Tanz's trust and confidence by asking Mrs. Tanz to transfer $100,000 to a privately held trucking company controlled by Defendant Kasakove, which she agreed to do.

34.    Following Plaintiff's $100,000 investment in defendant's trucking company in 2001 until 2006, defendant Kasakove repeatedly assured plaintiff that she should not worry about her finances, and that he would continue to provide her with adequate income from her investment in his company.

35.    However, in December 2006, defendant Kasakove advised plaintiff that he would no longer provide her with income from her investment in his trucking company because he claimed to have sold the business.

36.    Thus, in December 2006, plaintiff realized that defendant's assurances and promises of ongoing income for her support were intended to lull her into failing to commence an action against defendant for the mismanagement of her finances.

37.     Moreover, notwithstanding the fact that Mrs. Tanz was an investor in the trucking company, Defendant Kasakove only returned to Plaintiff her initial investment, but paid Plaintiff no share of the proceeds of the alleged sale of the trucking company.

38.

## EQUITABLE ESTOPPEL

39.     As a result of defendant Kasakove's promise to continue to provide plaintiff with adequate income, defendant Kasakove lulled plaintiff into believing that it was not necessary for her to seek the advice of counsel or commence litigation pertaining to defendants' improper representations and mismanagement of her funds.

40.     Defendant Kasakove misrepresented to plaintiff that (i) under his financial management she would spend only her investment income; (ii) that in the period 1997 to 2001 plaintiff had plenty of money for the expenses she was incurring; and (iii) from 2001 to 2006, defendant Kasakove fraudulently represented to plaintiff that defendant would provide plaintiff with ongoing income on which to live.

41.     Based on Mrs. Tanz's lack of financial knowledge and the personal hardships she was enduring, coupled with the fact that defendant Kasakove had taken upon himself the role of her fiduciary, Mrs. Tanz justifiably relied on Defendant Kasakove's decisions and recommendations and believed defendant Kasakove's misrepresentations.  As a result, plaintiff and was lulled into a false sense of security by Defendant Kasakove.

42.     Plaintiff, in reasonable reliance on defendant Kasakove's assurances, delayed in bringing this suit until now.

43.     Defendant Kasakove, as plaintiff's fiduciary, wrongly induced plaintiff to invest in his own company, and fraudulently represented to plaintiff that he would provide her with income on which to live, in order to lull plaintiff so that she would refrain from commencing legal action against defendant Kasakove for his breaches of his fiduciary duty.

44.     Thus, defendant's conduct caused the plaintiff to delay the bringing of this lawsuit.

45.     Based on the foregoing, in the event that defendants assert the limitations defense, defendants may be estopped from taking advantage of defendant Kasakove's own wrongful conduct by the application of the doctrine of equitable estoppel.

## COUNT I
### (Breach of Fiduciary Duty)

46.     Plaintiff repeats and realleges each of the allegations asserted in paragraphs 1 through 45 of this complaint as though fully stated herein.

47.     Mrs. Tanz reposed trust and confidence in Defendant Kasakove, and Defendant Kasakove took advantage of Mrs. Tanz's trust and lack of sophistication.

48.     In addition, Defendant Kasakove assumed a position of strength in relation to Mrs. Tanz by holding himself out as an expert in money managing.

49.     Defendant Kasakove imprudently advised Mrs. Tanz that she depart from her frugal lifestyle and incur expenses she had not previously incurred at any time in her life.

50.     Defendant Kasakove failed to advise Mrs. Tanz that the spending he recommended she undertake was actually being paid for out of her principal.

51.     As a result Mrs. Tanz without her knowledge depleted her financial resources, thereby depriving herself of adequate principal to generate the investment income she had planned to live on as an elderly widow.

52.     Thus, defendant Kasakove made fraudulent misstatements of fact to Mrs. Tanz and fraudulently concealed pertinent information, to wit, that the extravagant personal expenses he advised her to incur were being paid for out of her original principal.

53.     Defendant Kasakove, as Mrs. Tanz's attorney-in-fact, owed a duty to her to disclose any information that was relevant to the affairs entrusted to him.  Specifically, Defendant Kasakove owed a duty to Mrs. Tanz to manage her accounts in the conservative manner that she had requested, to properly advise her, to disclose all pertinent information and avoid all self-dealing.

54.     Defendant Kasakove's duty was heightened in the instant case due to the fact that Defendant Kasakove had vastly superior knowledge to Mrs. Tanz.

55.     Defendant Kasakove, as Mrs. Tanz's attorney-in-fact, breached his duty to satisfy the high standard of loyalty to which all fiduciaries are bound, including the duty that all disclosures be complete and unequivocal.

56.     Defendant Kasakove breached his fiduciary duty by failing to disclose the true state of Mrs. Tanz's investment portfolio.

57.     Defendant Kasakove, as Mrs. Tanz's attorney-in-fact, breached his fiduciary duty by failing to advise his client of facts material to her investment decisions, *i.e.*, he failed to advise Mrs. Tanz that the spending that he was recommending she undertake was being paid out of her principal – not her investment income, as she believed.

58.     Defendant Kasakove breached his duty to act with regard to Mrs. Tanz's financial matters, which had been entrusted to him, with the same degree of prudence and diligence as prudent individuals of discretion and intelligence employ in their own like affairs.

59.     Defendant Kasakove breached his fiduciary duty of prudence by advising Mrs. Tanz that she depart from her frugal lifestyle and incur expenses that depleted her principal.

60.     Defendant Kasakove breached his duty, as Mrs. Tanz's attorney-in-fact, to act in the utmost good faith and undivided loyalty toward his principal, Mrs. Tanz, and to act in accordance with the highest principles of morality, fidelity, loyalty and fair dealing.

61.     Similarly, defendant Kasakove breached his duty, as Mrs. Tanz's attorney-in-fact, to utilize the Power of Attorney he had been given for the benefit of his principal, to achieve what is in Mrs. Tanz's best interest.

62.     Defendant Kasakove breached his duty of loyalty and his duty to act for the benefit of his principal's best interest by misleading Mrs. Tanz into believing as a result of Defendant's management of her finances, she had plenty of money and had doubled her principal, and that any losses that occurred subsequently were due to market forces – not spending and mismanagement.

63.     Upon information and belief, defendant Kasakove did this so that Mrs. Tanz would provide $100,000 for defendant Kasakove's trucking company.

64.     In other words, defendant Kasakove misled Mrs. Tanz regarding the state of her finances under his management in order to cause her to make her funds available for his personal needs.

65.     Accordingly, as Mrs. Tanz's attorney-in-fact , Defendant Kasakove breached his fiduciary duties (i) to make all disclosures complete and unequivocal, (ii) to advise

his client of facts material to her investment decisions, (iii) to act with regard to Mrs. Tanz's financial matters, which had been entrusted to him, with the same degree of prudence and diligence as prudent individuals of discretion and intelligence employ in their own like affairs, (iv) to act with the utmost loyalty and (v) to act in his principal's best interest.

66.    Based on the foregoing, defendant Kasakove was responsible for the depleting of plaintiff's financial resources and thus depriving her of adequate investment income on which to live out her senior years.

67.    As a result, Plaintiff is entitled to receive damages resulting from her loss of investment income.

68.    Based on the foregoing, defendant Kasakove has exhibited a very high degree of moral culpability.  Therefore, defendant Kasakove's breach of his fiduciary duties gives rise to liability even in the absence of damages, and plaintiff is entitled to receive punitive damages.

69.    Defendant Kasakove is also required to disgorge any ill-gotten gain arising from the investment of $100,000 of Mrs. Tanz's funds in defendant Kasakove's trucking company, even if Plaintiff sustained no direct economic loss.


**COUNT II**
**AGAINST DEFENDANT KASAKOVE**
**(Intentional Infliction of Emotional Distress)**

70.    Plaintiff repeats and realleges each of the allegations asserted in paragraphs 1 through 69 of this complaint as though fully stated herein.

71.     In 2003, plaintiff began to ask questions to defendant Kasakove regarding his management of her finances and began to ask for assurances that she would not lose the $100,000 she had invested in Defendant Kasakove's for his trucking company.

72.     In response to plaintiff's efforts to regain control of her financial life and to rest that control from defendant Kasakove, defendant Kasakove began a campaign of intimidation against plaintiff.

73.     From 2003 to 2006 defendant Kasakove terrified Mrs. Tanz with demonstrations of fierce anger over her inquiries into the true state of her finances and her $100,000 investment.

74.     As a result of defendant Kasakove's deliberate campaign of intimidation, defendant inflicted severe mental pain and anguish on Mrs. Tanz.

75.     Because of the control defendant Kasakove maintained over plaintiff and the intimidation that defendant applied to plaintiff, plaintiff began to suffer from anxiety related disorders.  These disorders, including insomnia and depression, were magnified by Plaintiff's shocking loss of her financial security.

76.     Plaintiff saw a doctor and the doctor prescribed medications for plaintiff and recommended further treatment.

77.     As a result of the said conduct of defendant, plaintiff was made sick, nervous, depressed, unable to sleep, and unable to properly eat and digest her food; plaintiff was compelled to obtain medical aid in an endeavor to restore her health and incurred medical bills; and plaintiff still suffers from the same psychological and physical injuries.


WHEREFORE, plaintiff respectfully requests the following relief:

(i)    On Count I, against Defendants Eugene Kasakove and Markas Financial Services, Inc for Breach of Fiduciary Duty, special damages according to proof at the time of trial, general damages according to proof at the time of trial, disgorgement of ill-gotten gains and punitive damages according to proof at time of trial;

(ii)   On Count II, against Defendant Eugene Kasakove for Intentional Infliction Of Emotional Distress, special damages according to proof at the time of trial, general damages according to proof at the time of trial, and punitive damages according to proof at time of trial; and

(iii)  Such other relief the Court may deem reasonable and interest and costs of the action.

Dated: March 17, 2008
       New York, New York

Respectfully submitted,

Richard M. Mortner (RM-0019)
40 Broad Street, 5th Floor
New York, NY 10004
Tel. 212-480-2181

Attorney for Plaintiff Phylis Tanz

M 51 — Statutory short form of General Power of Attorney; with affidavit of attorney, GOL §§ 5-1501: 12 pt. type, 12-94

JULIUS BLUMBERG, INC.
PUBLISHER, NYC 10013

# Power of Attorney

**Notice: This is an important document. Before signing this document, you should know these important facts. The purpose of this power of attorney is to give the person whom you designate (your "Agent") broad powers to handle your property, which may include powers to pledge, sell, or otherwise dispose of any real or personal property without advance notice to you or approval by you. You may specify that these powers will exist even after you become disabled, incapacitated, or incompetent. The powers that you give your Agent are explained more fully in New York General Obligations Law, Article 5, Title 15, Sections 5-1502A through 5-1503, which expressly permits the use of any other or different form of power of attorney desired by the parties concerned. This document does not authorize anyone to make medical or other health care decisions for you. If there is anything about this form that you do not understand, you should ask a lawyer to explain it to you.**

**Know Everyone by These Presents**, which are intended to constitute a GENERAL POWER OF ATTORNEY pursuant to Article 5, Title 15 of the New York General Obligations Law:

That I

PHYLLIS ROSOV TANZ

do hereby appoint:

*(insert name and address of the principal)*

EUGENE L. KASAKOVE   167 STEPHENS PARK HACKETTSTOWN N.

*(If 1 person is to be appointed agent, insert the name and address of the agent above)*

*(If 2 or more persons are to be appointed agents with each agent to be able to act ALONE without requiring the consent of any other agent appointed in order to act, insert the name and address above of each agent SEPARATELY appointed and BE SURE TO insert the word "OR" between EACH designation of an agent to show that EACH agent has COMPLETE power to act alone)*

*(If 2 or more persons are to be appointed agents to act TOGETHER and requiring the JOINT consent of ALL appointed agents to act with no one agent to be able to act alone, insert the names and addresses above of all agents JOINTLY appointed and BE SURE TO insert the word "AND" between EVERY designation of each agent to indicate that ALL agents listed are required to act together and NONE can act alone)*

MY ATTORNEY(S)-IN-FACT TO ACT

*(If more than one agent is designated and the principal wants each agent alone to be able to exercise the power conferred, insert in this blank the word "SEPARATELY")*

*(If more than one agent is designated and the principal wants all of the designated agents together to exercise the power conferred, insert in this blank the word "JOINTLY")*

*(The failure to make any insertion in this blank will require the agents to act either separately or jointly, in accordance with the principal's use of the word "OR" or the other word "AND" between every respective designation of such agents above. If the principal's wishes cannot be determined because he or she fails to insert the word "OR", "AND", "SEPARATELY", or "JOINTLY" as he or she is asked to do above, the principal will be deemed to require the agents designated above to act jointly)*

IN MY NAME, PLACE AND STEAD in any way which I myself could do, if I were personally present, with respect to the following matters as each of them is defined in Title 15 of Article 5 of the New York General Obligations Law to the extent that I am permitted by law to act through an agent:

**Initial in the opposite box any one or more of the subdivisions as to which the principal WANTS to give the agent authority.**

**(NOTICE: The principal must write his or her initials in the corresponding blank space of a box below with respect to each of the subdivisions (A) through (N) below for which the principal WANTS to give the agent(s) authority. If the blank space within a box for any particular subdivision is NOT initialed, NO AUTHORITY WILL BE GRANTED for matters that are included in that subdivision)**

(A) real estate transactions; ................................ [ PRT ]
(B) chattel and goods transactions; ................... [ PRT ]
(C) bond, share and commodity transactions; [ PRT ]
(D) banking transactions; ................................. [ PRT ]
(E) business operating transactions; ................. [ PRT ]
(F) insurance transactions; ............................... [ PRT ]
(G) estate transactions; ..................................... [ PRT ]
(H) claims and litigation; ................................... [ PRT ]

(I) personal relationships and affairs; ........... [ PRT ]
(J) benefits from military service; ................... [ PRT ]
(K) records, reports and statements; ............... [ PRT ]
(L) full and unqualified authority to my
    attorney (s)-in-fact to delegate any
    or all of the foregoing powers
    to any person or persons whom my
    attorney (s)-in-fact shall select; ................. [ PRT ]
(M) all other matters; ........................................ [ PRT ]

(N) **if the blank space in the box to the right is initialed by the principal, this power of attorney shall not be affected by the subsequent disability or incompetence of the principal;** .................. [ PRT ]

*(Special provisions and limitations may be included in the statutory short form power of attorney only if they conform to the requirements of section 5-1503 of the New York General Obligations Law.)*

**To induce any third party to act hereunder, I hereby agree that any third party receiving a duly executed copy or facsimile of this instrument may act hereunder, and that revocation or termination hereof shall be ineffective as to such third party unless and until actual notice or knowledge of such revocation or termination shall have been received by such third party, and I for myself and for my heirs, executors, legal representatives and assigns, hereby agree to indemnify and hold harmless any such third party from and against any and all claims that may arise against such third party by reason of such third party having relied on the provisions of this instrument.**

**In Witness Whereof,** I have hereunto signed my name and affixed my seal on

December 6 _____ 19 96                        _____ (Seal)
                                                *(Signature of Principal)*

Editor's note: If the principal wishes to grant the agent the power to make gifts, language authorizing such gifts should be added, including, if desired, specific limitations as to the amounts or the recipients of the gifts or a direction that the gifts be made only pursuant to a past pattern begun by the principal.

## ACKNOWLEDGEMENTS

STATE OF *N E W*  *Y o r l C*    COUNTY OF *N E W*  *Y o r l L*    ss.:

On *D E C E M B E R*  *6,*    19*76* before me personally came *P h y L L i s  R .  T A N Z*
to me known, and known to me to be the individual    described in, and who executed the foregoing instrument,
and *She*    acknowledged to me that *S* he    executed the same.

CHARLES W. LEWIS
Notary Public, State of New York
No. 01LE7533430
Qualified in Kings County
Commission Expires Sept. 30, 1998

STATE OF                         COUNTY OF                         ss.:

On                         19        before me personally came
to me known, and known to me to be the individual    described in, and who executed the foregoing instrument,
and    he    acknowledged to me that    he    executed the same.

## AFFIDAVIT THAT POWER OF ATTORNEY IS IN FULL FORCE
*(Sign before a notary public)*

STATE OF                         COUNTY OF                         ss.:

being duly sworn, deposes and says:

1. The Principal within did, in writing, appoint me as the Principal's true and lawful ATTORNEY(S)-IN-FACT in the within Power of Attorney.
2. I have no actual knowledge or actual notice of revocation or termination of the Power of Attorney by death or otherwise, or knowledge of any facts indicating the same. I further represent that the Principal is alive, has not revoked or repudiated the Power of Attorney and the Power of Attorney still is in full force and effect.
3. I make this affidavit for the purpose of inducing

to accept delivery of the following Instrument(s), as executed by me in my capacity as the ATTORNEY(S)-IN-FACT, with full knowledge that this affidavit will be relied upon in accepting the execution and delivery of the Instrument(s) and in paying good and valuable consideration therefor:

Sworn to before me on

Publisher's Note: This document is printed on 100% cotton paper. Unlike ordinary photocopy paper, this stock resists turning brittle and browning with age. Because of its unique properties it conveys a feeling of importance. Unlike an important document, turning brittle and browning with age. Because of its unique properties it conveys a feeling of importance. Unlike an important document.
The publisher maintains property rights in the layout, graphic design and typestyle of this form as well as in its company's trademarked logo and name.

Case 1:08-cv-01462-LAK    Document 16-9    Filed 06/16/2008    Page 7 of 9

PHYLLIS ROSOV TANZ
715 PARK AVENUE  APT 10D
NEW YORK, NEW YORK 10021

TO

# Power of Attorney

Statutory Short Form

EUGENE L. KASAKOVE
167 STEPHENS PARK
HACKETTSTOWN, NJ 07840

Dated December 6, 1996

**THE MARKAS GROUP**
167 STEPHENS PARK ROAD
HACKETTSTOWN, NJ 07840
TEL: (908) 850-3820  FAX: (908) 850-9455

July 14, 2001

Mrs. Phyllis R. Tanz
715 Park Avenue Apt 10D
New York City, NJ 10021-5047

Dear Phyllis:

In further reference to our conversation of the other day, I will briefly outline both the risk and the reward of the project. Should you decide to come on-board, this letter and my signature thereon, will also serve to **Guarantee** your investment, as to principal. I cannot guarantee the income on your investment, but I believe that my estimates are on the low side.

Here is how it works:

1.  In the first week which will probably be the week **starting** July 27th or August 3rd at the latest, we should start billing the customers at about $60,000.00 to $75,000.00 per week.
2.  It could take eight (8) weeks for us to start receiving payments from the companies we have billed.
3.  At eight weeks (+- 60 days) it will take $500,000.00 to $600,000.00 to finance the receivables
4.  For this reason I have taken in three (3) partners, with you being one. I will finance the balance over $300,000.
5.  For the first sixty (60) days there will be no payments made to the (now) four investors.
6.  A deduction is made from each invoice in the amount of four (4%) percent. Thus for each $100,000.00 invested, a deduction of $4,000.00 is made. **IF** we are only paid every sixty days (and I believe that some payments will come in thirty (30) to forty-five (45) days) the return on investment (ROI) will be 24% before margin interest. This assumes a "turn" of six times per year. I believe we should come closer to 30% due to all invoices not taking 60 days to be paid.
7.  **After that time, the money should roll in since the full amount will be invested. Payments to investors will be made monthly starting the third month after the first receivable is established. Within 60 days after the first payment is made I hope to go to a semi-monthly payment schedule. Unless otherwise requested, payments will be made directly to your brokerage account.**
8.  **The bottom line is that after sixty days, we should receive payments more or less weekly.**

**I will not need all the funds at once. I would like a weekly contribution of $25,000 from each investor, starting with my initial call, which as I said should be about the 3rd of August. If you are in agreement, I will send you four (4) Authorizations for Smith Barney to wire to the above named account, the appropriate funds.**

**If you have any questions, please contact me as soon as possible. If you do not wish to proceed, please advise me at your earliest as other investors are standing by.**

Sincerely,

Eugene L. Kasakove



## MARKAS FINANCIAL SERVICES, INC.

167 STEPHENS PARK ROAD
HACKETTSTOWN, NEW JERSEY 07840-5518
TEL (908) 850-3820     FAX (908) 850-9455
E-MAIL: MARKASFI@WORLDNET.ATT.NET

February 12, 2004

Peter J. Strauss
Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177-1211

RE: Phyllis R. Tanz r: The Markas Group

Dear Mr. Strauss:

Mrs. Tanz "invested" (WITH) as a loan $100,000.00 (paid by her in four installments in 2001) (Investment) in The Markas Group (as noted in my acknowledgement and yours), a division of MARKAS FINANCIAL SERVICES, INC. She has no equity, but has my personal guarantee as to her principal. All this is clearly stated in the letters referred to by you and clearly stated to Mrs. Tanz numerous times. A 1099 interest was supplied for each year and filed with the IRS.

She has received in 2001: $  2,976.70 (One quarterly payment on Nov 10th 2001)
She has received in 2002: $ 20,284.36
She has received in 2003: $ 15,091.76
  Total                   $ 38,352.82

In 2004 she has received  $ 4,662.08 after a withdrawal of $5,000.00 in principal by Mrs. Tanz. Her current principal Loan balance is $ 95,000.00.

Mrs. Tanz has expressed her comfort level with me and you are in possession of all pertinent documents. I fail to understand what it is that you do not understand. I also believe you were retained to prepare a will wherein she would protect her daughter from creditors and loss of "Medicare" or similar benefits.

  1.     It is not an equity investment
  2.     Its is a loan (guaranteed by Markas and me individually)
  3.     You are in possession of all documents related to her loan.

If you have any further questions, I am available by any means shown above

Sincerely,

Eugene L. Kasakove
President
ELK/es
Cc: Mrs. Tanz

FINANCIAL MANAGEMENT FOR THE WAY YOU WANT TO LIVE

SSB Transmittal Ltr



## MARKAS FINANCIAL SERVICES, INC.

STEPHENS PARK ROAD
HAVE RIVERSTOWN, NEW JERSEY 07840-5518
TH (908) 850-3820   FAX (908) 850-9455
E-MAIL MARKASH@WORLDNET.ATT.NET

July 10, 2003

Mrs. Phyllis Rosov TAnz
715 Park Avenue, APT 10D
New York City, NY 10021-5047

Dear Phyllis:

As you may be aware, I am rapidly approaching the years of three score and ten (70 to most of you) and I have planned for this time by substantially reducing my client list. Due to the number of clients I have let go, I can no longer maintain my SEC Registration and thus need individual approval from all clients **for each account** over which I am to exercise control. As one of the selected clients to be maintained, I am enclosing the appropriate forms **(One of which for each account must be signed in the presence of a notary)** for each account as well as a self addressed USPS mail envelope. It is imperative that you attend to this as quickly as possible as I cannot function with Smith Barney without it. If you have any questions please feel free to call me. If you chose **not** to continue with me for whatever reason please **mail back to me** your acceptance (by signing the appropriate documents if you continue) or not signing them but by returning your information to MARKAS FINANCIAL SERVICES, INC. "e" mail is not acceptable.

Happily, my mind and body are still functioning well and health is not the reason for this action.

Thank you for choosing me as well as MARKAS FINANCIAL SERVICES, INC. as your source for financial management.

Sincerely,

Eugene L. Kasakove
President
ELK/es
Encls.

FINANCIAL MANAGEMENT FOR THE WAY YOU WANT TO LIVE

in 6 mo.

He took copy of this
to "look ree" how to
cut down

12,000

mo. —

#
162,000.

Worth: as of Sept 30 on 6

In
Debt

34,435. —

Dept (credit card)   Citi      13,000. —
                     Chase     14,785. 10
                     Dentist    6,6__.__

Take 5,000,
from Ira
to pay bills

3500 —

ask to be paid monthly
must monthly
(Nov)

To be paid monthly

Con Edison          346.31   (2 mos)
Rent               1634.28
Cable               182.90 — cut down) — 1 TV.
Poland Sp.           37.61
AT+T!                70.00 — 1 phone
Insurance           152.00
Cell phone           40.95          159,000. —
Drug Store (Clydes) 130.__
Chase Bank          280.00          10 yrs
Health Coverage     204.10
Am Ex  Visa        1557.75
                    300.10          5/54.28
George              288. —

+5/54.28   @ which must
                              19,434.

CONFIDENTIAL

**Triple i / CliniForms**

**PATIENT REGISTRATION**

Name _Phyliss Tang_  4/3/34  SS# _112 32 0738 A_

Street Address _715 Park Ave 10-D_  Date of birth _69_  Marital status: S  M  W.  Sep  D

City _10021_  State _____

Telephone:  Home _628-5436_  Office _____

Referred by: _Shaun Kaplan, (787-7524_

Spouse's name _275-CPW_  _744-5050_

Spouse's employer / address _____  _Pharm 288-6966_

Emergency contact _____  Tel# _____  Relationship _____

COPY

## PATIENT EMPLOYER INFORMATION

Employer name _____  Tel# _____

Employer street address _____  City / State _____  Zip _____

Patients occupation _____

## INSURED PERSON (IF NOT PATIENT)

Name _____  Tel# _____

Street Address _____  City / State _____  Zip _____

Relationship to patient _____

## INSURANCE

Medicaid # (if applicable) _____  Medicare # (if applicable) _____

Primary Insurance Company Name _____

ID # _____  Group # _____  Tel. # _____

Secondary Insurance Company Name _____

ID # _____  Group # _____  Tel. # _____

## INFORMATION AND ASSIGNMENT OF BENEFITS

I authorize the release of any medical information necessary to process this claim. I permit a copy of this authorization to be used in place of the original.

Date _4/16/03_  Signature _Phyllis Tang_

I hereby authorize Dr. _____ to apply for benefits on my behalf for covered services rendered by him/her, or by his/her order. I request that payment from my insurance company be made directly to Dr. _____ (or to the party who accepts assignment).

I certify that the information I have reported with regard to my insurance coverage is correct.

I permit a copy of this authorization to be used in place of the original. This authorization may be revoked by either me or my insurance company at any time by writing.

Date _4/16/03_  Signature _Phyllis Tang_
(Patient, parent, or guardian)

**The clean that won't cause skin reactions**

all Free Clear

**PROGRESS NOTES**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NAME | | | | | DATE OF BIRTH | | PG# |
| DATE - TIME CPT CODE | HT WT | BMI | BP | P | T | ALLERGIES | |

4/16/08  m Re – Sharon Kaplan – question "Clinical depression"
but isn't sure – can't see how pill will help a situation
that is real –
– Diabetes 500 mg Glucophage – exercise helps, good stress
test –
husband died 6 y. ago – trouble sleeping, has lost good
friends
son 49 – 2 heart surgeries – diabetes
daughter 52 – recent dx c̄ MS –
husband – (2nd husband) died in her
good marriage – 7 years – Prostate Ca – fearful –
therapy has helped – had many legal problems after his death
has lost most of her money – causes anxiety – & loneliness
has good social skills – spent life as couple
was married at age 17 – her education was life – is artistic
interior design, flower design –
Therapist – says its the way she perceives things
depression – fear of money – can't trust – doesn't talk c̄ sis –
tightness in shoulders – worries –
Question where does she fit –
Lipitor
500 C, Solgar adv anti ox – Centrum Silver, Caltrate
½ Maxide –
daughter – involved c̄ man who had musc. dystrophy –
Sees her unhappiness – got her down –
"Sharon says" when down – staying home, fearful
comes & goes – no suicidal thoughts –
Grew up Westside N.Y.
does feel good when doing something she likes, is appreciated
has happy disposition –
thoughts –

**citalopram HBr**
**Well-tolerated SSRI therapy**

**A favor**    **expression**

Please see full prescribing information in separate accompanying booklet.

FOREST PHARMACEUTICALS, INC.

| DATE - TIME CPT CODE | HT WT | BMI | BP | P | T | ALLERGIES | Formedic |
|---|---|---|---|---|---|---|---|

no a drug taken –
hysterectomy – age 44 fibroids ✓
She sees Dr. Kaufman 3x ✓
— therapy helps c loneliness — deep loneliness
4/30 realizes more tearful, wakes arnd 4:30
can only go to sleep with TV on, feels surrounded by memories
no ambition → feels unloved
able to discuss more sx of depression
Trial Zoloft 50mg c ½ pm #30 (start ½ tab)

5/21 – sleeps better, less anxious but still feels sad
may feel slightly less fearful –
↑ Zoloft 50mg 1½ q HS #45 x3
also takes Centrum Silver, anti oxidants, Ca++, C & E.

6/18 feeling better, sleeps better — some ↓ word retrieval
better able to deal c issues of the day
less sad, not crying — craving to eat is less —
has clearly improved, better able to focus + getting things done —
Continue Zoloft @ 75mg/day 100mg –

7/8 – feels low grade dysphoria – but tackling things ie well
is lonely but needs space – visit on wkend

9/10/03 – feeling much better after 2 whs on ginseng –
– Nutrition has helped c wgt loss – more social –
sleeping better – appetite fine. tends to move from subj to subj
Continue meds as is

10/15 feeling sad, holidays or something – feeling overwhelmed
continues to get out + exercise, on wgt loss program
many tasks to do including changes to her will b/c of daughter c MS
↑ Zoloft – 50mg iii q pm #90 x3 – start 125mg/day

11/24 – down, not crying, blow out c daughter (48) – who ran out c man c MDystrophy
daughter developed MS – inv. 40 daughter mailed other + said she hates her –
will be alone for Thanksgiving – daughter having affair c German –
# has remained Zoloft 125 –
↑ Zoloft 150mg

1/13/04 NS


citalopram HBr
Well-tolerated SSRI therapy

A favorable expression

Please see full prescribing information in separate accompanying booklet.
FOREST PHARMACEUTICALS, INC.
Pharmaceuticals · Therapeutics · Managed Care · Specialty Sales   6/01

| PSYCHIATRY | OFFICE VISITS | FORMEDIC |
|---|---|---|
| NAME | INSURANCE # | S  M  W  D |
| ADDRESS | PHONES (H) | (O) |
| OCCUPATION | DATE OF BIRTH | AGE |
| MEDICATIONS | | |
| DRUG ALLERGIES | REFERRED BY | |

| DATE | HISTORY & PHYSICAL |
|---|---|

Wellbutrin 100mg SR ī q AM #30 x3

Zoloft 100mg ī q PM #30 x3

3/21/06 - had been feel tension & would get confused while out
but is gone - memory is good, has financial pressure
mood low & sad, tearful, lack of joy
sleep mostly ok + has gain weight

Celexa

using Zoloft 125mg          Lipitor 20mg + Zytia 10mg
Wellbutrin 100mg SR ii q AM     Glucophage 500mg BID
                                Diovan 80mg
long recurrent depression        Diuretic —
Plan ↑ Zoloft to 150mg
Zoloft 100mg #60 x3
Wellbutrin 100mg SR ī q AM #60 x3

5/15
6/21 - pt daughter in hosp, she has hip prob.
but feels is healing & issues - is more forgetful
& gets overtime abt now after taking wellbutrin
reduce Wellbutrin to 100mg q AM
pt Zoloft ↓ to 125mg
6/28 - feels calmer, less anxious, daughter is out of
hospital but now considered to be have M.S. or Bipolar
is sleeping fine
9/20 Zoloft 100mg ii q PM #60 x3   using 125
12/22 - money issues - money was mishandled by advisor
loss of money causes great deal anxiety & stress -
mood - low & weepy, sleep ok, effort to talk & people
to enjoyment            Glucophage 1000mg BID
    Wellbutrin 100mg SR + AM     Diovan 160
    Zoloft 125mg q d             Lipitor 20, Zydis 10mg
                                Actose 15

RESTORIL (temazepam) C

Hypnotic activity there when you need,
not when you don't

| DATE - TIME | HT | BMI | BP | P | T | ALLERGIES |
| CPT CODE | WT | | | | | |

1/18/07 Increased Zoloft 150m ⊆ HS or 25m in afternoon
has helped & anxiousness & has improved sleep.

5/25 days later - accident in shower, burns, in jaw -
just released from hosp.
continuing financial problems, issues of mismanagement
doesn't feel any pleasure -                         Effexor 87.5m
continues exercise
has lost some wght on diet
sleep erratic —                                      Glucophage -
                                                     Actose -
↑ Zoloft    add 25m in afternoon                    Diovan -
                                                     Lipitor / Zydra

Zoloft 100m π ʒ d #60 x}
( Wellbutrin 100m π ʒ AM #30 x3 — (usinp 1)

7/11 - feeling much better - feels meds have helped
& found lawyer to take her case.
use Zoloft 150m ʒ PM; 25m in daytime if need
Wellbutrin 100m ʒ AM

15/0 - concerned of Wellbutrin makes her sleepy - but
currently it isn't -

11/2 late shers of waiting for lawyer to file case in Fed. Court
started Yoga - feeling alright. Watches diet & exercise

1/29 Wellbutrin 100m SR π Am #60 x3 (usm 1)

3/21/08 Sertraline 100m π ʒ d #60 x3





For DEPRESSION and ANXIETY

A POWERFUL SSRI
that's well tolerated

Lexapro
escitalopram oxalate
POWER TO ENJOY LIFE

LITHO IN CANADA

Formedic