UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PHYLIS TANZ, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 08-cv-01462-LAK |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| EUGENE KASAKOVE and | : | |
| MARKAS FINANCIAL SERVICES, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CIVIL ACTION: THIRD AMENDED COMPLAINT**

Plaintiff Phyllis Tanz, by her attorney Richard M. Mortner, Esq., for her complaint against Defendants respectfully alleges as follows:

**NATURE OF THE ACTION**

1.     Plaintiff, a widow, aged 73 years, alleges breach of fiduciary duty against her former attorney-in-fact, financial advisor and accountant defendant Eugene Kasakove and his company Markas Financial Services Inc.  Plaintiff alleges that defendant Kasakove's actions, individually and through Markas Financial Services Inc., was malicious, oppressive and fraudulent, and Plaintiff seeks lost investment income, disgorgement, punitive damages and attorneys' fees in excess of the statutory jurisdictional amount.  Plaintiff also seeks damages for intentional infliction of emotional distress in excess of the statutory jurisdictional amount.

**VENUE AND JURISDICTION**

2.      Subject matter jurisdiction exists based on 28 U.S.C. §1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because the controversy is between citizens of different states.

3.      Personal jurisdiction over the Defendants also is proper based on New York Civil Practice Law and Rules § 302, and Rule 4 of the Federal Rules of Civil Procedure, subparagraphs (e) and (h).

4.      Personal jurisdiction and venue in this action are predicated on 28 U.S.C. § 1391(a), since a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

**THE PARTIES**

5.      Plaintiff, Phyllis Tanz, is a citizen of the State of New York.  She resides at 715 Park Avenue, New York, NY 10021

6.      Upon information and belief, Defendant Eugene Kasakove is a citizen of the State of New Jersey, and resides at 167 Stephens Park Road, Hackettstown, NJ 07840.

7.      Upon information and belief, defendant Markas Financial Services, Inc. ("MFS") is incorporated in the State of New Jersey, with its principal place of business at 167 Stephens Park Road, Hackettstown, NJ 07840.

8.      Upon information and belief, defendant Kasakove is the president of MFS.

9.      Upon information and belief, Defendant MFS, at all material times herein, was acting on its own behalf and as an agent for defendant Kasakove.  All acts and omissions by MFS alleged herein are imputable to defendant Kasakove by virtue of the aforesaid agency relationship.

2

## FACTUAL BACKGROUND

10.    Plaintiff, Mrs. Tanz, married Norman Tanz in 1989.  On November 3, 1996, after battling cancer for two years, Mr. Tanz died.

11.    Mrs. Tanz was a dedicated wife, mother and homemaker. Mrs. Tanz's life as a housewife did not equip her with the financial sophistication she needed following the death of her husband.  However, she was acutely aware that she needed to use the utmost caution in handling her limited assets.

12.    During her husband's illness and in the difficult period that followed, Mrs. Tanz found that she could not keep up with the medical and household bills.

13.    Thus, in the period just prior to Norman Tanz's death, defendant Kasakove, who had been Mrs. Tanz's accountant since 1995, began coming to Mrs. Tanz's home and helping Mrs. Tanz organize her bills.

14.    Following the passing of her husband Mrs. Tanz was under enormous stress.  In addition to grieving over her loss, she was sick with Bell's palsy, type-2 diabetes, and high blood pressure.  In addition, her son suffered a heart attack and had to undergo open heart surgery, Mrs. Tanz's daughter became ill with multiple sclerosis, and lastly, her step-children were contesting her late-husband's will.

15.    During this difficult period, defendant Kasakove visited Mrs. Tanz in her home and offered to take over the management of Mrs. Tanz's financial matters.  He told Mrs. Tanz he was not only an accountant, but that he also provided expert services as a stockbroker and financial manager through his company, Defendant MFS.

3

16.     As an elderly woman, Mrs. Tanz firmly believed that the best thing to do was to invest her money very safely and live off of the interest.  She had enough for her needs and she wanted the emotional security of knowing that her money was prudently managed.

17.     Mrs. Tanz told defendant Kasakove she needed to feel safe and secure; she was very conservative and wanted to live off of her income, not her principal.

18.     Defendant Kasakove agreed with this concept.

19.     On December 6, 1996, one month after Norman Tanz died; Mrs. Tanz signed a power of attorney prepared by defendant Kasakove, which accorded defendant Kasakove broad powers over every aspect of Mrs. Tanz's financial life (the "Power of Attorney").

20.     Defendant Kasakove billed Mrs. Tanz for his service by sending invoices in the name of his company, defendant Markas Financial Services, Inc.

21.     After obtaining Mrs. Tanz's Power of Attorney, defendant Kasakove persuaded Mrs. Tanz to move her nest egg of approximately $493,767 from her broker for the prior 17 years to a new broker who was a friend of defendant Kasakove, Donn Kerr.  In this way defendant Kasakove cut Mrs. Tanz off from the last of her advisors and protectors.

22.     Eventually, Plaintiff invested another $31, 000, making the total amount of her funds placed under Defendants' control $525,767.

23.     Mrs. Tanz owned no property or tangible assets of any significant value. Thus, defendant Kasakove exercised control over virtually all of Plaintiff's assets.

24.     Mrs. Tanz lodged complete trust in defendant Kasakove.  defendant Kasakove supervised every aspect of Mrs. Tanz's financial life, including the payment of her bills.  In addition, as Mrs. Tanz's attorney-in-fact, defendant Kasakove assisted Mrs. Tanz in

4

working with her lawyers to resolve her dispute with her late husband's children and to close the estate.

25.     Mrs. Tanz so relied upon defendant Kasakove that before she would spend any money she would ask defendant Kasakove whether she could afford the proposed expense.

26.     Immediately upon taking control of Mrs. Tanz's financial life, defendant Kasakove began providing Mrs. Tanz falsely inflated reports regarding the performance of her portfolio under Defendants' management.  Defendant Kasakove consistently advised Mrs. Tanz that she "had plenty of money."

27.     Time and again, defendant Kasakove assured Mrs. Tanz that she was a wealthy woman, assured her that she could afford the expenses she was considering and encouraged her to change her frugal lifestyle.

28.     Thus, Mrs. Tanz began to spend money on a lifestyle she had never known before.

29.     Defendant Kasakove advised Mrs. Tanz that these expenditures were being paid from her investment income.

30.     Thus, defendant Kasakove approved, and indeed encouraged, Mrs. Tanz to incur expenses on luxury items such as the following:

        a.     Extended stays in Florida at the Boca Raton Hotel, Renaissance Hotel, Holiday Inn Hotel;

        b.     A cruise on the Radisson through the Panama Canal and to Costa Rica;

        c.     Membership at The Friars Club; and

        d.     Membership at the Town Club.

31.     Defendant Kasakove misled Mrs. Tanz into falsely believing that, as a result of Defendants' management of her portfolio and financial affairs, she had become

substantially wealthier than when she had appointed defendant Kasakove her attorney-in-fact, and that she was living on the investment income Defendants had earned for her through management of her assets.

32.     However, the reality of Mrs. Tanz's financial health was quite different than the rosy picture represented by defendant Kasakove.  In fact, during the period 1997 to 2001, as a result of defendant Kasakove's financial management, misleading and false reports and financial recommendations, Plaintiff had unknowingly spent most of her principal.

33.     In 2001, defendant Kasakove took advantage of Mrs. Tanz's trust and confidence by asking Mrs. Tanz to transfer $100,000 to a privately held trucking company controlled by defendant Kasakove, which she agreed to do.

34.     Following Plaintiff's $100,000 investment in Defendant's trucking company in 2001 until 2006, defendant Kasakove repeatedly assured Plaintiff that she should not worry about her finances, and that he would continue to provide her with adequate income from her investment in his company.

35.     However, in December 2006, defendant Kasakove advised Plaintiff that he would no longer provide her with income from her investment in his trucking company because he claimed to have sold the business.

36.     Thus, in December 2006, Plaintiff realized that Defendant's assurances and promises of ongoing income for her support were intended to lull her into failing to commence an action against Defendant for the mismanagement of her finances.

37.     Moreover, notwithstanding the fact that Mrs. Tanz was an investor in the trucking company, defendant Kasakove only returned to Plaintiff her initial investment, but paid Plaintiff no share of the proceeds of the alleged sale of the trucking company.

## EQUITABLE ESTOPPEL

**a.  December 1996 to December 2006:   The Fiduciary Relationship Between
    defendant Kasakove and Plaintiff**

38.    As stated above, on December 6, 1996, Plaintiff, Phyllis Tanz, signed a

Power-of-Attorney form prepared by defendant Kasakove, which accorded defendant Kasakove

broad powers over every aspect of Mrs. Tanz's financial life (the "Power of Attorney").  A copy

of the December 6, 1996 Power-of-Attorney is annexed hereto as Exhibit 1.

39.    As Plaintiff's attorney-in-fact, defendant Kasakove became Plaintiff's

fiduciary.

40.    As Plaintiff's fiduciary, defendant Kasakove oversaw and exercised

discretionary authority with respect to every aspect of Plaintiff's financial life.

41.    In addition to being Plaintiff's attorney-in-fact, defendant Kasakove also

was empowered as the executor of Plaintiff's estate, Plaintiff's health care proxy and the trustee

of the supplemental trust for the benefit of Plaintiff's daughter who receives government

assistance due to multiple sclerosis.

42.    Defendant Kasakove, acting through his company, defendant Markas

Financial Services, Inc., continued in his role as Plaintiff's trusted fiduciary and attorney-in-fact

until December 2006.

43.    The ongoing fiduciary relationship between defendant Kasakove and Mrs.

Tanz is evidenced in a letter from defendant Kasakove to Mrs. Tanz, dated July 10, 2003, in

which Defendant states that due to his advancing years "I have planned for this time by

substantially reducing my client list."  The 2003 letter goes on to refer to Mrs. Tanz "as one of

the selected clients to be maintained," and concludes by stating, "Thank you for choosing me as

well as MARKAS FINANCIAL SERVICES, INC. as your source for financial management."  A copy of defendant Kasakove's letter of July 10, 2003 is annexed hereto as Exhibit 2.

44.    Defendant Kasakove's fiduciary relationship with Plaintiff continued into December 2006, at which time defendant Kasakove advised Plaintiff to lower her monthly expenses.  The foregoing is evidenced by a worksheet for a monthly budget created by Plaintiff at defendant Kasakove's direction.  The worksheet contains handwritten comments by defendant Kasakove, such as "Take $5,000 from IRA to pay bills," and "Cut down  - to 1 TV."  A copy of the December 2006 budget worksheet is annexed hereto as Exhibit 3.

45.    The fiduciary relationship begun in December 1996 between defendant Kasakove and Plaintiff was ended by defendant Kasakove in December 2006 at a meeting in Plaintiff's home, in which defendant Kasakove told Plaintiff to get a new financial manager.

**b.**    **July 2001 to December 2006:  Defendants' Actions that Kept Plaintiff From Timely Bringing Suit**

46.    In the middle of 2001, upon information and belief, it became apparent to defendant Kasakove that as Plaintiff's fiduciary and financial manager he had mismanaged her finances, such that approximately 80% of her original nest egg, with which she began in 1996, was gone by 2001.

47.    Therefore, to mollify Plaintiff and to avoid a legal action from Plaintiff, Defendants embarked on a series of actions intended to lull Plaintiff so that she would refrain from commencing legal action against Defendants for breach of fiduciary duty.

48.    To begin, defendant Kasakove, induced Plaintiff to invest $100,000 in his own company, and promised Plaintiff that from this investment, he would provide her with ongoing income on which to live.  A copy of Plaintiff's offering to Mrs. Tanz is annexed hereto as Exhibit 4.

8

49.     The company in which defendant Kasakove induced Plaintiff to invest was called The Markas Group, which is a division of defendant Markas Financial Services, Inc., the very company through which defendant Kasakove managed Plaintiff's assets.

50.     As Plaintiff's fiduciary, defendant Kasakove's conduct in soliciting her investment in a company controlled by him constituted improper self-dealing.

51.     However, in this way Defendants were able to insure that Plaintiff received just enough return on her investment as was necessary to lull her into refraining from commencing legal action against Defendants for breach of fiduciary duty.

52.     Thus, Defendants paid Plaintiff extraordinary returns on her $100,000 investment in Defendants' company to lull her into a false sense of security.  Upon information and belief, Defendants paid Plaintiff on her investment from 2002 through 2006 annual returns of more than 20%, 15%, 13%, 13% and 18%, respectively.

53.     In addition, defendant Kasakove made promises to Plaintiff that he would always provide her sufficient income on which to live from her investment.  Defendant Kasakove even gave assurances to Mrs. Tanz of his continued support in a joking manner, saying, "Phyllis, you'll never become a bag lady."

54.     In addition, shortly after deploying Mrs. Tanz's remaining assets in his own company, as above described, defendant Kasakove committed another breach of fiduciary duty.  Disabled by the emotional trauma of her widowhood and life changes, Mrs. Tanz was seeking a strong figure to fill the role of protector and advisor formerly played by her late husband.  defendant Kasakove preyed on this weakness, expanding their relationship to include distinctly unbusiness-like aspects, as follows:

a) Kasakove kept a key to Mrs. Tanz's apartment and picked up her mail;

b) On occasion Kasakove worked from Mrs. Tanz's apartment and had a user ID on her computer;

c) Kasakove met with Mrs. Tanz socially and took her to expensive dinners;

d) Kasakove sent flowers to Mrs. Tanz on birthdays and upon her return from trips;

e) When Mrs. Tanz wanted to work to earn additional income, defendant Kasakove discouraged her from doing so;

f) When Mrs. Tanz could not afford to attend her best-friend's wedding in Florida, Kasakove gave her $625 cash from his pocket to cover the expense, saying, "You're going to that wedding;" A copy of the deposit slip for these funds, identifying the money as "Gene's gift," is annexed hereto as Exhibit 5.

55.    Thus, defendant Kasakove improperly assumed the role of Mrs. Tanz's surrogate husband, supporter and protector.

56.    In 2006, when Plaintiff realized that defendant Kasakove had grossly mismanaged her nest egg, he said to Plaintiff, "I guess I fell off my white horse."

57.    In 2003, Mrs. Tanz considered bringing a timely action against Defendants as a result of the loss of most of her nest egg. In 2003 she consulted a lawyer, Peter Strauss, Esq. regarding a wills question pertaining to her daughter. In the course of the consultation Attorney Strauss raised concerns about Defendants' handling of Plaintiff's financial affairs and advised Plaintiff that she may have a legal claim against Defendants.

58.    However, Plaintiff never took any further steps toward instituting suit until 2007. Plaintiff declined to institute suit because of the actions of Defendants, to wit (i) defendant Kasakove's promise to continue to provide Plaintiff with sufficient income on which to live, (ii) Defendants' payments of double-digit returns on her $100,000 investment in Defendants' own

10

company; and (iii) defendant Kasakove's assumption of the role of Mrs. Tanz's surrogate husband, supporter and protector.

59.     As a result of the foregoing, Defendants lulled Plaintiff into refraining from instituting suit related to Defendants' breaches of fiduciary duty in connection with the mismanagement of her funds.

60.     Upon information and belief, defendant Kasakove did not intend to fulfill his promises to Plaintiff of continued financial support, upon which Plaintiff relied.

61.     Thus, Defendants' false assurances and wrongful conduct caused Plaintiff to delay the bringing of this lawsuit, only to find in 2006, after Defendant's promise was broken, that the statute of limitations had run.

c.     **December 2006:  The Termination of Defendants' Financial Support of Plaintiff, and the Termination of defendant Kasakove's Role as Plaintiff's Fiduciary.**

62.     In December 2006, defendant Kasakove advised Plaintiff that he would no longer provide her with income from her investment in his company because he claimed to have sold the business.

63.     Thereupon, at a meeting in Plaintiff's home, defendant Kasakove paid back to Mrs. Tanz her initial investment of $100,000 in The Markas Group.  defendant Kasakove failed to pay Plaintiff any equity share from the proceeds of the sale of the business.

64.     This was the same December 2006 meeting at which defendant Kasakove terminated his role as Plaintiff's fiduciary and told Plaintiff to get a new financial manager.

65.     Thus, in December 2006, Plaintiff came to the crushing realization that Defendants' conduct from 2001 to 2006 in paying high returns on her investment, and defendant Kasakove's assurances of ongoing income for her support, as well as defendant Kasakove's

11

assumption of the role of surrogate husband, supporter and protector, were actions by Defendants intended to lull her into failing to commence an action against Defendants for the mismanagement of her finances from 1996 to 2001.

       **d.**      **December 2006 to February 2008:  Plaintiff's Efforts to Institute Suit.**

      66.     In January 2007, several weeks after defendant Kasakove abruptly severed his emotional and fiduciary relationship with Plaintiff, Plaintiff's daughter Judy was injured with third-degree burns over one-third of her body  She was hospitalized under intensive care, and underwent two surgical procedures.  In April 2007 Judy was released from the hospital, and Plaintiff immediately began taking steps towards instituting suit against Defendants.

      67.     On or about April 26, 2007, Plaintiff consulted with Eric Seiff, Esq. and Mariana Olenko, Esq. of Seiff Kretz & Abercrombie.  As a result, Attorney Olenko prepared for Plaintiff a new power of attorney, last will and testament, living will and health care proxy, and supplemental trust for the benefit of Plaintiff's daughter, and revoked the ones that empowered defendant Kasakove as Plaintiff's attorney-in-fact, executor of Plaintiff's will, Plaintiff's health care proxy and the trustee of the supplemental trust for Plaintiff's daughter.   A copy of Attorney Olenko's letter to defendant Kasakove advising of these revocations is annexed hereto as Exhibit 6.

      68.     At that time, Plaintiff also consulted with Howard Meyers, Esq. and Robert G. Heim, Esq. of Meyers & Heim LLP regarding instituting an action against Defendants for breach of fiduciary duty.  However, Meyer & Heim declined to represent Plaintiff in such an action because they believed any claim she had against Defendants was most likely time-barred.

69.     On or about May 8, 2007, Plaintiff consulted with a third attorney, Jenice Malecki, Esq.  However, Attorney Malecki also declined to represent Plaintiff in an action against Defendants.

70.     Finally, on or about June 29, 2007, Plaintiff consulted a fourth attorney, her current counsel, Richard M. Mortner, Esq., who she was able to retain to bring an action against Defendants.

71.     At that time, Plaintiff did not know or understand that her losses were in part due to her own misguided spending.  In fact, Plaintiff's counsel undertook her representation, believing she most likely had a claim against her former financial manager and fiduciary, defendant Kasakove, and against her former stock broker, Smith Barney, arising under the Doctrine of Unsuitability.

72.     Consequently, Plaintiff and her counsel mustered Plaintiff's account documents and forwarded them for analysis to Barry Levine, an expert in securities markets who frequently testifies as an expert witness in investor claims.

73.     On August 29, 2007, Mr. Levine reported back that, in fact, Smith Barney had yielded a small net profit in Plaintiff's investment portfolio and that the decline in her principle was attributable to withdrawals not losses.

74.     This disclosure came as a surprise to Plaintiff.  Plaintiff had not realized that she had, in effect, spent her own principal.  This spending was due to two factors:

a)    At the time Mrs. Tanz was spending her money, defendant Kasakove was encouraging her to do so, telling her she was a wealthy woman; and

b)    When Mrs. Tanz looked at her Smith Barney account statements, at the time she was spending her money, the statements showed her that she had nearly doubled her original investment to approximately $1,000,000; consequently Mrs. Tanz believed defendant Kasakove's words that she had

13

become wealthy.

c)  However, Plaintiff's gains were unrealized, and when the market fell in 2001, Plaintiffs gains were all but reversed. Thus, Plaintiff's spending resulted in a loss of her original investment.

75.    To an unsophisticated investor, such as Plaintiff, defendant Kasakove's advice to spend her money appeared reasonable and justified, due to her seeing the gains in her investment portfolio.  However, defendant Kasakove failed to make Plaintiff aware of the risks that remained with her account.  Eventually these unrealized gains disappeared due to downward market movement.

76.    Defendant Kasakove was advising his 68-year old, widowed client to spend her unrealized gains, while he failed to move these unrealized gains out of stocks into less risky assets to protect her profits; and he failed to disclose to Plaintiff this risk in her nest egg account.

77.    In October 2007, Plaintiff's counsel contacted Plaintiff and advised her that he had discerned that it would still be possible to bring a claim against Defendants due to an exception in New York law that permits a claim for punitive damages against a fiduciary, even in the absence of actual damages.  As a result, Plaintiff and her counsel began to prepare the instant action which was eventually filed in February 2008.

78.    Thus, beginning at the end of December 2006, when Defendants terminated their fiduciary relationship with Plaintiff, until February 2008, when Plaintiff instituted suit, Plaintiff acted at all times with alacrity and perseverance to bring the instant claim against Defendants.

79.    Based on all of the foregoing, in the event that Defendants assert the limitations defense, Defendants may be estopped from taking advantage of defendant Kasakove's own wrongful conduct by the application of the doctrine of equitable estoppel.

**COUNT I**
**(Breach of Fiduciary Duty)**

80.    Plaintiff repeats and realleges each of the allegations asserted in paragraphs 1 through 79 of this complaint as though fully stated herein.

81.    Mrs. Tanz reposed trust and confidence in defendant Kasakove, and defendant Kasakove took advantage of Mrs. Tanz's trust and lack of sophistication.

82.    In addition, defendant Kasakove assumed a position of strength in relation to Mrs. Tanz by holding himself out as an expert in money managing.

83.    Defendant Kasakove imprudently advised Mrs. Tanz that she depart from her frugal lifestyle and incur expenses she had not previously incurred at any time in her life.

84.    Defendant Kasakove failed to advise Mrs. Tanz that the spending he recommended she undertake was actually being paid for out of her principal.

85.    As a result Mrs. Tanz without her knowledge depleted her financial resources, thereby depriving herself of adequate principal to generate the investment income she had planned to live on as an elderly widow.

86.    Thus, defendant Kasakove made fraudulent misstatements of fact to Mrs. Tanz and fraudulently concealed pertinent information, to wit, that the extravagant personal expenses he advised her to incur were being paid for out of her original principal.

87.    Defendant Kasakove, as Mrs. Tanz's attorney-in-fact, owed a duty to her to disclose any information that was relevant to the affairs entrusted to him.  Specifically, defendant Kasakove owed a duty to Mrs. Tanz to manage her accounts in the conservative manner that she had requested, to properly advise her, to disclose all pertinent information and avoid all self-dealing.

88.    Defendant Kasakove's duty was heightened in the instant case due to the fact that defendant Kasakove had vastly superior knowledge to Mrs. Tanz.

89.    Defendant Kasakove, as Mrs. Tanz's attorney-in-fact, breached his duty to satisfy the high standard of loyalty to which all fiduciaries are bound, including the duty that all disclosures be complete and unequivocal.

90.    Defendant Kasakove breached his fiduciary duty by failing to disclose the true state of Mrs. Tanz's investment portfolio.

91.    defendant Kasakove, as Mrs. Tanz's attorney-in-fact, breached his fiduciary duty by failing to advise his client of facts material to her investment decisions, *i.e.*, he failed to advise Mrs. Tanz that the spending that he was recommending she undertake was being paid out of her principal – not her investment income, as she believed.

92.    Defendant Kasakove breached his duty to act with regard to Mrs. Tanz's financial matters, which had been entrusted to him, with the same degree of prudence and diligence as prudent individuals of discretion and intelligence employ in their own like affairs.

93.    Defendant Kasakove breached his fiduciary duty of prudence by advising Mrs. Tanz that she depart from her frugal lifestyle and incur expenses that depleted her principal.

94.     Defendant Kasakove breached his duty, as Mrs. Tanz's attorney-in-fact, to act in the utmost good faith and undivided loyalty toward his principal, Mrs. Tanz, and to act in accordance with the highest principles of morality, fidelity, loyalty and fair dealing.

95.     Similarly, defendant Kasakove breached his duty, as Mrs. Tanz's attorney-in-fact, to utilize the Power of Attorney he had been given for the benefit of his principal, to achieve what is in Mrs. Tanz's best interest.

96.     defendant Kasakove breached his duty of loyalty and his duty to act for the benefit of his principal's best interest by misleading Mrs. Tanz into believing as a result of Defendant's management of her finances, she had plenty of money and had doubled her principal, and that any losses that occurred subsequently were due to market forces – not spending and mismanagement.

97.     Upon information and belief, defendant Kasakove did this so that Mrs. Tanz would provide $100,000 for defendant Kasakove's trucking company.

98.     In other words, defendant Kasakove misled Mrs. Tanz regarding the state of her finances under his management in order to cause her to make her funds available for his personal needs.

99.     Accordingly, as Mrs. Tanz's attorney-in-fact , defendant Kasakove breached his fiduciary duties (i) to make all disclosures complete and unequivocal, (ii) to advise his client of facts material to her investment decisions, (iii) to act with regard to Mrs. Tanz's financial matters, which had been entrusted to him, with the same degree of prudence and diligence as prudent individuals of discretion and intelligence employ in their own like affairs, (iv) to act with the utmost loyalty and (v) to act in his principal's best interest.

100.    Based on the foregoing, defendant Kasakove was responsible for the depleting of Plaintiff's financial resources and thus depriving her of adequate investment income on which to live out her senior years.

101.    As a result, Plaintiff is entitled to receive damages resulting from her loss of investment income.

102.    Based on the foregoing, defendant Kasakove has exhibited a very high degree of moral culpability.  Therefore, defendant Kasakove's breach of his fiduciary duties gives rise to liability even in the absence of damages, and Plaintiff is entitled to receive punitive damages.

103.    Defendant Kasakove is also required to disgorge any ill-gotten gain arising from the investment of $100,000 of Mrs. Tanz's funds in defendant Kasakove's trucking company, even if Plaintiff sustained no direct economic loss.

**COUNT II**
**AGAINST DEFENDANT KASAKOVE**
**(Intentional Infliction of Emotional Distress)**

104.    Plaintiff repeats and realleges each of the allegations asserted in paragraphs 1 through 79 of this complaint as though fully stated herein.

105.    In 2003, Plaintiff began to ask questions to defendant Kasakove regarding his management of her finances and began to ask for assurances that she would not lose the $100,000 she had invested in defendant Kasakove's for his trucking company.

106.    In response to Plaintiff's efforts to regain control of her financial life and to rest that control from defendant Kasakove, defendant Kasakove began a campaign of intimidation against Plaintiff.

18

107.    From 2003 to 2006 defendant Kasakove terrified Mrs. Tanz with demonstrations of fierce anger over her inquiries into the true state of her finances and her $100,000 investment.

108.    As a result of defendant Kasakove's deliberate campaign of intimidation, Defendant inflicted severe mental pain and anguish on Mrs. Tanz.

109.    Because of the control defendant Kasakove maintained over Plaintiff and the intimidation that Defendant applied to Plaintiff, Plaintiff began to suffer from anxiety related disorders.  These disorders, including insomnia and depression, were magnified by Plaintiff's shocking loss of her financial security.

110.    Plaintiff saw a doctor and the doctor prescribed medications for Plaintiff and recommended further treatment.

111.    As a result of the said conduct of Defendant, Plaintiff was made sick, nervous, depressed, unable to sleep, and unable to properly eat and digest her food; Plaintiff was compelled to obtain medical aid in an endeavor to restore her health and incurred medical bills; and Plaintiff still suffers from the same psychological and physical injuries.


WHEREFORE, Plaintiff respectfully requests the following relief:

(i)    On Count I, against Defendants Eugene Kasakove and Markas Financial Services, Inc for Breach of Fiduciary Duty, special damages according to proof at the time of trial, general damages according to proof at the time of trial, disgorgement of ill-gotten gains and punitive damages according to proof at time of trial;

(ii)     On Count II, against Defendant Eugene Kasakove for Intentional Infliction

Of Emotional Distress, special damages according to proof at the time of

trial, general damages according to proof at the time of trial, and punitive

damages according to proof at time of trial; and

(iii)    Such other relief the Court may deem reasonable and interest and costs of

the action.

Dated:  July 17, 2008
        New York, New York

Respectfully submitted,

Richard M. Mortner (RM-0019)
40 Broad Street, 5th Floor
New York, NY 10004
Tel. 212-480-2181

Attorney for Plaintiff Phyllis Tanz

M 51 — Statutory short form of General Power of Attorney:
with affidavit of attorney, GOL §§ 5-1501: 12 pt. type, 12-94

JULIUS BLUMBERG, INC.
PUBLISHER, NYC 10013

# Power of Attorney

**Notice: This is an important document. Before signing this document, you should know these important facts. The purpose of this power of attorney is to give the person whom you designate (your "Agent") broad powers to handle your property, which may include powers to pledge, sell, or otherwise dispose of any real or personal property without advance notice to you or approval by you. You may specify that these powers will exist even after you become disabled, incapacitated, or incompetent. The powers that you give your Agent are explained more fully in New York General Obligations Law, Article 5, Title 15, Sections 5-1502A through 5-1503, which expressly permits the use of any other or different form of power of attorney desired by the parties concerned. This document does not authorize anyone to make medical or other health care decisions for you. If there is anything about this form that you do not understand, you should ask a lawyer to explain it to you.**

**Know Everyone by These Presents,** which are intended to constitute a GENERAL POWER OF ATTORNEY pursuant to Article 5, Title 15 of the New York General Obligations Law:

That I            PHYLLIS ROSOV TANZ                                        do hereby appoint:
            *(insert name and address of the principal)*

            EUGENE L. KASAKOVE  167 STEPHENS PARK HACKETTSTOWN N.
    *(If 1 person is to be appointed agent, insert the name and address of the agent above)*

*(If 2 or more persons are to be appointed agents with each agent to be able to act ALONE without requiring the consent of any other agent appointed in order to act, insert the name and address above of each agent SEPARATELY appointed and BE SURE TO insert the word "OR" between EACH designation of an agent to show that EACH agent has COMPLETE power to act alone)*

*(If 2 or more persons are to be appointed agents to act TOGETHER and requiring the JOINT consent of ALL appointed agents to act with no one agent to be able to act alone, insert the names and addresses above of all agents JOINTLY appointed and BE SURE TO insert the word "AND" between EVERY designation of each agent to indicate that ALL agents listed are required to act together and NONE can act alone)*

MY ATTORNEY(S)-IN-FACT TO ACT

*(If more than one agent is designated and the principal wants each agent alone to be able to exercise the power conferred, insert in this blank the word "SEPARATELY")*

*(If more than one agent is designated and the principal wants all of the designated agents together to exercise the power conferred, insert in this blank the word "JOINTLY")*

*(The failure to make any insertion in this blank will require the agents to act either separately or jointly, in accordance with the principal's use of the word "OR" or the other word "AND" between every respective designation of such agents above. If the principal's wishes cannot be determined because he or she fails to insert the word "OR", "AND", "SEPARATELY", or "JOINTLY" as he or she is asked to do above, the principal will be deemed to require the agents designated above to act jointly.)*

IN MY NAME, PLACE AND STEAD in any way which I myself could do, if I were personally present, with respect to the following matters as each of them is defined in Title 15 of Article 5 of the New York General Obligations Law to the extent that I am permitted by law to act through an agent:

**Initial in the opposite box any one or more of the subdivisions as to which the principal WANTS to give the agent authority.**

**(NOTICE: The principal must write his or her initials in the corresponding blank space of a box below with respect to each of the subdivisions (A) through (N) below for which the principal WANTS to give the agent(s) authority. If the blank space within a box for any particular subdivision is NOT initialed, NO AUTHORITY WILL BE GRANTED for matters that are included in that subdivision)**

(A) real estate transactions; ............................... [ PRT ]

(B) chattel and goods transactions; .................. [ PRT ]

(C) bond, share and commodity transactions; [ PRT ]

(D) banking transactions; ................................... [ PRT ]

(E) business operating transactions; ................. [ PRT ]

(F) insurance transactions; ............................... [ PRT ]

(G) estate transactions; ...................................... [ PRT ]

(H) claims and litigation; .................................... [ PRT ]

(I) personal relationships and affairs; ............ [ PRT ]

(J) benefits from military service; .................. [ PRT ]

(K) records reports and statements; ............... [ PRT ]

(L) full and unqualified authority to my attorney(s)-in-fact to delegate any or all of the foregoing powers to any person or persons whom my attorney(s)-in-fact shall select; ................... [ PRT ]

(M) all other matters; ...................................... [ PRT ]

(N) **if the blank space in the box to the right is initialed by the principal, this power of attorney shall not be affected by the subsequent disability or incompetence of the principal;** ................... [ PRT ]

*(Special provisions and limitations may be included in the statutory short form power of attorney only if they conform to the requirements of section 5-1503 of the New York General Obligations Law.)*

**To induce any third party to act hereunder, I hereby agree that any third party receiving a duly executed copy or facsimile of this instrument may act hereunder, and that revocation or termination hereof shall be ineffective as to such third party unless and until actual notice or knowledge of such revocation or termination shall have been received by such third party, and I for myself and for my heirs, executors, legal representatives and assigns, hereby agree to indemnify and hold harmless any such third party from and against any and all claims that may arise against such third party by reason of such third party having relied on the provisions of this instrument.**

**In Witness Whereof,** I have hereunto signed my name and affixed my seal on

_December 6_          19 96          _Lucia Ann Lane_ (Seal)

*(Signature of Principal)*

Editor's note: If the principal wishes to grant the agent the power to make gifts, language authorizing such gifts should be added, including, if desired, specific
limitations as to the amounts or the recipients of the gifts or a direction that the gifts be made only pursuant to a past pattern begun by the principal.

## ACKNOWLEDGEMENTS

STATE OF *New York*    COUNTY OF *New York*    ss.:

On *December  6,*    19 *96* before me personally came *Phyllis R. Tanz*
to me known, and known to me to be the individual    described in, and who executed the foregoing instrument,
and *She*    acknowledged to me that *S*he    executed the same.

CHARLES W. LEWIS
Notary Public, State of New York
No. 01LE7533430
Qualified in Kings County
Commission Expires Sept. 30, 1998

STATE OF                          COUNTY OF                          ss.:

On                          19          before me personally came
to me known, and known to me to be the individual    described in, and who executed the foregoing instrument,
and    he    acknowledged to me that    he    executed the same.

## AFFIDAVIT THAT POWER OF ATTORNEY IS IN FULL FORCE
*(Sign before a notary public)*

STATE OF                          COUNTY OF                          ss.:

being duly sworn, deposes and says:

1. The Principal within did, in writing, appoint me as the Principal's true and lawful ATTORNEY(S)-IN-FACT in the within
Power of Attorney.
2. I have no actual knowledge or actual notice of revocation or termination of the Power of Attorney by death or otherwise,
or knowledge of any facts indicating the same. I further represent that the Principal is alive, has not revoked or repudiated the
Power of Attorney and the Power of Attorney still is in full force and effect.
3. I make this affidavit for the purpose of inducing

to accept delivery of the following Instrument(s), as executed by me in my capacity as the ATTORNEY(S)-IN-FACT, with
full knowledge that this affidavit will be relied upon in accepting the execution and delivery of the Instrument(s) and in paying
good and valuable consideration therefor:

Sworn to before me on

Publisher's Note: This document is printed on 100% cotton paper. Unlike ordinary photocopy paper, this stock resists turning brittle and browning with age. Because this paper's fibers are long and strong, it is also tamper resistant document. The publisher maintains property rights in the layout, graphic design and typestyle of this form as well as in the trademarked logo and name.

PHYLLIS ROSOV TANZ
715 PARK AVENUE   APT 10D
NEW YORK, NEW YORK 10021

TO

**Power of Attorney**

Statutory Short Form

EUGENE L. KASAKOVE
167 STEPHENS PARK
HACKETTSTOWN, NJ 07840

Dated, December ____ 6 ____, 19 96 __

SSB Transmittal Ltr



MARKAS FINANCIAL SERVICES, INC.

567 STEPHENS PARK ROAD
HAVERSTOWN, NEW JERSEY 07840-5518
TEL (908) 850-3830    FAX (908) 850-9455
E-MAIL MARKASH@WORLDNET.ATT.NET

July 10, 2003

Mrs. Phyllis Rosov TAnz
715 Park Avenue, APT 10D
New York City, NY 10021-5047

Dear Phyllis:

As you may be aware, I am rapidly approaching the years of three score and ten (70 to most of you) and I have planned for this time by substantially reducing my client list. Due to the number of clients I have let go, I can no longer maintain my SEC Registration and thus need individual approval from all clients **for each account** over which I am to exercise control. As one of the selected clients to be maintained, I am enclosing the appropriate forms **(One of which for each account must be signed in the presence of a notary)** for each account as well as a self addressed USPS mail envelope. It is imperative that you attend to this as quickly as possible as I cannot function with Smith Barney without it. If you have any questions please feel free to call me. If you chose **not** to continue with me for whatever reason please **mail back to me** your acceptance (by signing the appropriate documents if you continue) or not signing them but by returning your information to MARKAS FINANCIAL SERVICES, INC. "e" mail is not acceptable.

Happily, my mind and body are still functioning well and health is not the reason for this action.

Thank you for choosing me as well as MARKAS FINANCIAL SERVICES, INC. as your source for financial management.

Sincerely,

Eugene L. Kasakove
President
ELK/es
Encls.

FINANCIAL MANAGEMENT FOR THE WAY YOU WANT TO LIVE

_(handwritten notes)_

~~6 mo.~~   He took copy of this "look see" how to   12,000
~~mo.~~ — cut down

#
162,000.

<u>Worth:</u> as of Sept 30 am @

In Debt
34,435. —

Dept (credit cards)   Citi    13,000. —
                      Chase   14,785. 10
                      Dentist  6,650.00                Take 5,000,
                      ~~~~~~~~~~~~                     from Ira
                                  3500 —               to pay bills

ask to be paid monthly
                     must monthly
To be paid monthly        ( Nov )
Con Edison           346.31  (2 mos)
Rent                1634.28
                     182.90 — cut down) — 1TV.
Cable                 37.61                     15,000 —
Poland Sp.            70.00 — 1 phone
AT+T                 152.00                      10 yrs
Insurance             40.95
Cel phone            130.00
Drug Store (Clydes)  280.00                     5154.28
Chase Bank           204.10
Health Coverage     1557.75
Am Ex Visa.          ~~300~~ 10
George                288
                   + 5154.28   @ much must
                                          17,434.

**THE MARKAS GROUP**
**167 STEPHENS PARK ROAD**
**HACKETTSTOWN, NJ 07840**
TEL: (908) 850-3820   FAX: (908) 850-9455

July 14, 2001

Mrs. Phyllis R. Tanz
715 Park Avenue Apt 10D
New York City, NJ 10021-5047

Dear Phyllis:

In further reference to our conversation of the other day, I will briefly outline both the risk and the reward of the project. Should you decide to come on-board this letter and my signature thereon, will also serve to **Guarantee** your investment, as to principal. I cannot guarantee the income on your investment, but I believe that my estimates are on the low side.

Here is how it works:

1.  In the first week which will probably be the week **starting** July 27th or August 3rd at the latest, we should start billing the customers at about $60,000.00 to $75,000.00 per week.
2.  It could take eight (8) weeks for us to start receiving payments from the companies we have billed.
3.  At eight weeks (+- 60 days) it will take $500,000.00 to $600,000.00 to finance the receivables
4.  For this reason I have taken in three (3) partners, with you being one. I will finance the balance over $300,000.
5.  For the first sixty (60) days there will be no payments made to the (now) four investors.
6.  A deduction is made from each invoice in the amount of four (4%) percent. Thus for each $100,000.00 invested, a deduction of $4,000.00 is made. IF we are only paid every sixty days (and I believe that some payments will come in thirty (30) to forty-five (45) days) the return on investment (ROI) will be 24% before margin interest. This assumes a "turn" of six times per year. I believe we should come closer to 30% due to all invoices not taking 60 days to be paid.
7.  **After that time, the money should roll in since the full amount will be invested. Payments to investors will be made monthly starting the third month after the first receivable is established. Within 60 days after the first payment is made I hope to go to a semi-monthly payment schedule. Unless otherwise requested, payments will be made directly to your brokerage account.**
8.  **The bottom line is that after sixty days, we should receive payments more or less weekly.**

**I will not need all the funds at once. I would like a weekly contribution of $25,000 from each investor, starting with my initial call, which as I said should be about the 3rd of August. If you are in agreement, I will send you four (4) Authorizations for Smith Barney to wire to the above named account, the appropriate funds.**

**If you have any questions, please contact me as soon as possible. If you do not wish to proceed, please advise me at your earliest as other investors are standing by.**

Sincerely,

Eugene L. Kasakove



## SEIFF KRETZ & ABERCROMBIE

CHARLES D. ABERCROMBIE*
WALTER A. KRETZ, JR.
ERIC A. SEIFF
———
MARIANA OLENKO

*ALSO ADMITTED IN CT

444 MADISON AVENUE
30TH FLOOR
NEW YORK, N.Y. 10022-6926
(212) 371-4500
FAX (212) 371-6883

ROLAND R. ACEVEDO
OF COUNSEL

May 14, 2007

<u>Certified Mail Return Receipt Requested</u>
Mr. Eugene L. Kasakove
167 Stephens Park Road
Hackettstown, New Jersey  07840-5518

Dear Mr. Kasakove:

Please be advised that Phyllis Tanz recently executed a new power of attorney, last will and testament, living will and health care proxy thereby revoking the ones that she had given you.  Kindly destroy all copies of the documents that Mrs. Tanz had given you in the past.

If you have any questions, please call me.

Thank you for your attention to this matter.

Very truly yours,

Mariana Olenko

cc:    Phyllis Tanz